# COURT OF APPEALS
## DECISION
## DATED AND FILED

## July 16, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP1359**

STATE OF WISCONSIN

Cir. Ct. No. **2021CV1404**

IN COURT OF APPEALS
DISTRICT IV

VERITAS VILLAGE, LLC,

   PLAINTIFF-RESPONDENT-CROSS-APPELLANT,

V.

CITY OF MADISON,

   DEFENDANT-APPELLANT-CROSS-RESPONDENT.

APPEAL and CROSS-APPEAL from an order of the circuit court for Dane County: STEPHEN E. EHLKE, Judge. *Affirmed*.

Before Graham, P.J., Blanchard, and Taylor, JJ.

¶1   GRAHAM, P.J.  Veritas Village, LLC, which owns an apartment building in the City of Madison, brought these now-consolidated actions

challenging three years of the City's tax assessments for the property. *See* WIS. STAT. § 74.37(3)(d) (2023-24).[1] Specifically, Veritas argued that the City has used assessment methodologies that result in other buildings in the "apartment strata" being assessed at values that are significantly below market value. Accordingly, Veritas argues, the City's assessments of Veritas's property, which represent full market value, violate the uniformity clause found in Article 1, Section 8 of the Wisconsin Constitution. Following a bench trial, the circuit court determined that Veritas met its burden to prove a uniformity violation in each of the challenged years, and it remanded to the City's board of review to determine the proper remedies for the violations.

¶2 The City appeals, challenging the circuit court's determination that Veritas proved uniformity violations in those years and also challenging a pretrial discovery sanction that the court imposed on the City. Veritas cross-appeals, challenging the court's decision to remand to the board of review. We reject both sets of arguments and affirm all challenged aspects of the court's order.

## BACKGROUND

¶3 Veritas owns a 189-unit luxury apartment building (the "Property" or the "Veritas Property") that is located in downtown Madison. At issue in this appeal are Veritas's challenges to the 2020, 2021, and 2022 tax assessments for the Property.

¶4 The City of Madison assesses the market value of properties throughout the city on an annual basis, and it collects property taxes based on

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

those values.[2]  Generally speaking, employees in the City's assessor's office do an initial assessment of all properties, and the City then provides a two-step administrative process by which a taxpayer can challenge an initial assessment.  In the first step, a taxpayer challenges the assessment with the board of assessors, which is comprised of appraisers associated with the assessor's office.  *See* MADISON GENERAL ORDINANCE § 33.03(2) (through June 18, 2026).  Then, in the second step, the taxpayer can challenge the assessment with the board of review, which is an independent body comprised of citizens.  *See* MADISON GENERAL ORDINANCE § 33.08(5) (through June 18, 2026); WIS. STAT. § 70.47.  After the board of review sets a final assessment, the administrative process is complete.  A taxpayer may then challenge the final assessment by filing a notice of claim with the City and, if the claim is disallowed, by filing a circuit court case under WIS. STAT. § 74.37(2).

¶5      As relevant here, the City used mass appraisal techniques to arrive at initial assessments during the relevant years.  Mass appraisal is a "system[at]ic appraisal of groups of properties, as of a given date, using standardized procedures and statistical testing," and it is "the underlying principle that Wisconsin assessors should be using to value properties in their respective jurisdictions." *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶29, 379 Wis. 2d 141, 905 N.W.2d 784 (citing a prior version of the Wisconsin Property Assessment Manual with

---

[2] Wisconsin cases use the term "market value," and sometimes "fair market value," to mean "the amount the property could be sold for in the open market by an owner willing and able but not compelled to sell to a purchaser willing and able but not obliged to buy." *State ex rel. Levine v. Board of Rev. of Vill. of Fox Point*, 191 Wis. 2d 363, 372, 528 N.W.2d 424 (1995). For consistency, we use the term "market value" for this concept throughout this opinion, and we use the phrase "full market value" to indicate 100 percent of market value.

language on this point that is identical to the 2022 version we cite in this opinion).[3] The City's initial assessments for the Veritas Property were $28,500,000 in 2020 and 2021, and $32,290,000 in 2022.

¶6    In each of those years, Veritas challenged its initial assessment using the above-described administrative process.  First, Veritas filed an objection with the board of assessors, and in response to each challenge, the board of assessors conducted a single property appraisal using a "tier 3 income approach."[4]  Then, in each of the years, Veritas requested a hearing with the board of review, which set the final assessed value at $32,290,000 in 2020 and 2021, and $38,350,000 in 2022.  The City imposed property taxes based on those final values and Veritas paid the amounts imposed.

---

[3] The Wisconsin Property Assessment Manual is published each year by the Wisconsin Department of Revenue pursuant to WIS. STAT. § 73.03(2a), and it "serves as the guide for uniform property assessment throughout the State." *Wisconsin Property Assessment Manual* at Introduction.  Throughout this opinion, we refer to this publication as the "Manual." "WISCONSIN STAT. § 70.32(1) requires that assessors adhere to the Manual, absent conflicting law." *See* **State ex rel. Stupar River LLC v. Town of Linwood Portage Cnty. Bd. of Rev.**, 2011 WI 82, ¶23 n.15, 336 Wis. 2d 562, 800 N.W.2d 468.

The circuit court found, for purposes of this dispute, that there are no significant differences between the 2020, 2021, and 2022 versions of the Manual, and neither party challenges this finding on appeal.  Like the circuit court, we cite to the 2022 version, which is available at https://www.revenue.wi.gov/documents/wpam22.pdf.

[4] A "tier 3 approach" is one of three tiers of an assessment methodology set forth in WIS. STAT. § 70.32(1) and described in **State ex rel. Markarian v. City of Cudahy**, 45 Wis. 2d 683, 173 N.W.2d 627 (1970).  As we discuss at greater length below, § 70.32(1) "sets forth a hierarchical valuation methodology for arriving at a property's fair market value." **Lowe's Home Ctrs., LLC v. City of Delavan**, 2023 WI 8, ¶27, 405 Wis. 2d 616, 985 N.W.2d 69, (citing **Markarian**, 45 Wis. 2d 683).  The statute identifies "three sources of information that inform tax assessments," and the methodology "has been described as providing three 'tiers' of analysis." *Id.*, ¶28 (citations omitted).

¶7     Veritas then initiated circuit court cases challenging the final assessments for these three years.  In each of the cases, Veritas alleged, among other things, that the City had assessed the Property at or above full market value while simultaneously assessing other comparable properties significantly below their market values.[5]  Therefore, Veritas alleged, it was bearing "an unreasonably disproportionate share of taxes on an ad valorem basis," and its assessments violated the uniformity clause of the Wisconsin Constitution.  The three cases were consolidated into a single action at the circuit court level.

¶8     Stepping back, this is not the first time that Veritas has challenged the City's tax assessment for the Property.  Of particular relevance is Veritas's challenge to its 2019 assessment, which was also based on the uniformity clause.  That challenge eventually led to an appeal before this court and our decision in *Veritas Village v. City of Madison*, No. 2022AP1934, unpublished slip op. (Dec. 7, 2023) ("*Veritas 2019*").  In that appeal, we provided a general framework for analyzing uniformity claims and we ultimately concluded that Veritas's summary judgment materials did not establish that the City's full market value assessment of Veritas's property violated the uniformity clause.  *Id.*, ¶34.  We concluded, in essence, that Veritas was not attempting to show that the City "singled out" its property for a discriminatory reassessment, nor that the City used an "arbitrary or improper" assessment methodology that systematically undervalued other properties in the district.  *Id.*, ¶¶34, 39.  Instead, Veritas had merely identified a handful of properties that were arguably underassessed, and as

---

[5] In the complaint it filed to challenge the 2020 and 2021 assessments, Veritas also claimed that the market value of the Property was no more than $23,000,000.  By the time of trial, Veritas dropped its claims that the 2020 and 2021 assessments exceeded market value.

such, its evidence failed to establish "a general underassessment of other property in the assessment district." *Id.*, ¶¶39, 46-50, 53.

¶9    At the time we issued our decision in *Veritas 2019*, the consolidated cases addressing the 2020, 2021, and 2022 assessments of the Property were in the midst of discovery. The parties had various discovery disputes, and both filed motions to compel discovery from the other party. Eventually, the circuit court entered an order sanctioning the City by requiring it to pay nearly $10,000 in attorney fees that Veritas incurred in connection with one of its motions to compel. We provide additional information about this discovery sanction, which the City challenges on appeal, as needed below.

¶10    In Veritas's expert witness disclosure, it provided a report prepared by Dominic Landretti. In his report, Landretti, who works in Wisconsin as a real estate valuation consultant, did not appraise the Property or offer an opinion of its market value. Landretti instead focused exclusively on the alleged uniformity violation. To that end, Landretti critiqued the City's assessment process, concluding that a "major issue[]" with the process was "the lack of supporting documentation of uniformity and the failure to follow the applicable Wisconsin Statutes, the Manual, and [International Association of Assessing Officers (IAAO)] Standards."[6]

---

[6] WISCONSIN STAT. § 70.32(1) also requires assessors to adhere to professionally acceptable standards of appraisal practice. One organization that provides guidance on such standards is the IAAO, and IAAO guidance was introduced as an exhibit to the summary judgment materials in this case. *See* International Association of Assessing Officers, *Standard on Ratio Studies* (2013), available at https://www.iaao.org/media/wp-content/uploads/Standard _on_Ratio_Studies.pdf (hereinafter "IAAO Standard").

¶11     Landretti's report, which was just shy of 180 pages, offered multiple analyses and opinions about the City's assessment process.  Some of Landretti's analyses addressed the "statutory class" of commercial properties, and other analyses were limited to the properties in the "apartment strata."[7]  We generally focus on Landretti's analysis of the "apartment strata" because that is the stratum to which the Veritas Property belongs.

¶12     At the core of Landretti's analysis was an opinion that was ultimately accepted by the circuit court—that a significant problem with the City's process was that it used different methods to set initial assessments for properties in the apartment strata, and that the mixing of different methodologies produced unequal results.  For those properties that had recently been sold in an arms-length transaction ("sales properties"), the City typically set the next year's assessments at or near the recent sales prices.  By contrast, for those properties that had not recently been sold ("non-sales properties"), the City typically used a "trend analysis" to set the next year's assessments, meaning that the City started with the values that had been determined in the prior year's assessments and applied a "multiplier" to adjust those values by set percentages.  The use of these different methodologies could theoretically result in reasonably uniform assessments if the

---

[7] We understand the term "statutory class" to refer to the following classes of property set forth in WIS. STAT. § 70.05(5)(a)1m.: residential; commercial (which the Manual defines to include apartment buildings with more than four units, *see Manual* at 13-1); undeveloped; agricultural forest; productive forest; personal property; and other.

The term "strata" refers to subsets of properties within a single class.  For purposes of analysis, the Manual directs assessors to "stratify" sales data for the purpose of analysis: "When analyzing the sales they should be divided into property groups that can be meaningfully compared against one another for valuation purposes.  This is known as stratification.  The sales should first be stratified by property classification.  If there are a large number of sales, it may be possible to further stratify the sales by neighborhood, age, size, etc." *Manual* at 6-12.  As we understand it, the "apartment strata" are a subset of the commercial class.

trending multipliers the City used were grounded on recent sales data, consistent with market conditions, and applied consistently. However, based on his statistical analysis comparing the average percentage of increase of assessments of sales properties versus non-sales properties in 2020, 2021, and 2022, Landretti opined that the trending multipliers that the City applied did not reflect market conditions, which resulted in general underassessment of the non-sales properties.

¶13 Landretti's report also addressed how the City's process affected its assessment of the Veritas Property. Veritas had challenged its assessments in 2018, 2019, 2020, 2021, and 2022, and every year that Veritas challenged its assessment, the City conducted a single-property appraisal and set its final assessment at full market value using methodologies that were grounded in data from recent sales. Therefore, Landretti opined, just like the apartment properties that had recently been sold, the City's process resulted in the Veritas Property also being appraised at its full market value. This resulted in a market value assessment of the Veritas Property that was excessive in comparison to the majority of apartment properties in the district, which had their assessments set through trending and were underassessed. As for the remedy for the uniformity violation, Landretti opined that the assessments for the Veritas Property should be reduced to the same level as comparable properties. Landretti identified different properties that could be considered comparable to the Veritas Property and different percentages of reductions that might be appropriate in each of the challenged years.

¶14 To rebut Landretti's uniformity analysis, the City produced a report authored by Kevin Keene. Keene, who works in Pennsylvania and is an expert in mass appraisal techniques, wrote that "no [assessment] office is ever 100% compliant with all of the [IAAO] standards," and that "most assessors work within

statutory frameworks and/or technical limitations that do not support the preferred approaches and methods, and are forced to settle on the best they can do." Keene did not offer any opinions about uniformity or the multipliers and trending factors that the City used to establish initial assessments. Instead, Keene opined, among other things, that particularities of Wisconsin law, and specifically the three-tier *Markarian* hierarchy, make it "difficult or impossible to uniformly assess" properties that have been subject to a recent sale with those that have not. Keene also questioned Landretti's use of statistical measures to evaluate the quality of the City's mass appraisal, and he opined that the use of such measures can be misleading, especially when they are based on small sample sizes. Regarding the appropriate remedy, Keene opined that if a class or strata of properties is underassessed, "the remedy is to raise values in that class [or strata] of property, not reduce properly assessed properties so they are also underassessed."[8]

¶15 At trial, the parties stipulated that the final assessments reflect the full market value of the Veritas Property in each of the tax years Veritas challenged. Therefore, the question for the circuit court was whether Veritas proved that the City violated the uniformity clause by assessing other comparable properties significantly below their fair market values.

¶16 After hearing testimony from Landretti, Keene, and various employees in the assessor's office and considering the parties' post-trial submissions, the circuit court ultimately determined that "the evidence conclusively establishes that the City underassessed the apartment strata in

---

[8] Landretti and Keene also offered opinions on a number of other matters, including the concept of sales chasing, the proper use of the *Markarian* hierarchy when conducting a mass appraisal, and regressivity, all of which we discuss as needed below.

violation of the uniformity clause." As for remedy, the court determined that Veritas is owed a refund of excessive taxes it paid in each of the years it challenged. However, based on the record evidence, the court found that it was unable to determine with reasonable certainty the amount of unlawful taxes that would be owed to Veritas in any of the challenged years. Therefore, the court remanded these matters to the City's board of review to conduct further proceedings to ensure uniformity with an appropriate set of comparable properties. The City appeals, and Veritas cross appeals.

## DISCUSSION

¶17 In its appeal, the City challenges the circuit court's determination about uniformity, and it also challenges the court's determination that the City violated discovery obligations and its imposition of a remedy for that violation. In its cross-appeal, Veritas challenges the court's decision to remand to the board of review to determine the remedies for the uniformity violations, and it asks us to determine the remedies and remand for the imposition of those remedies. In the discussion that follows, Section I addresses the City's challenge to the court's determination about uniformity, Section II addresses Veritas's challenge to the court's determination about remedies, and Section III addresses the City's challenge to the discovery sanction.

### I. The City's Challenge with Respect to Uniformity

¶18 A taxpayer faces a significant hurdle when challenging a municipal tax assessment for real property. This is because property assessments are generally afforded a "presumption of correctness." *See Metropolitan Assocs.*, 379 Wis. 2d 141, ¶50; WIS. STAT. § 70.49(2) ("The value of all real property entered into the assessment roll to which such affidavit is attached by the assessor shall, in

10

all actions and proceedings involving such values, be presumptive evidence that all such properties have been justly and equitably assessed in proper relationship to each other."). In challenging an assessment, a taxpayer may overcome the presumption by establishing that the assessment does not apply the principles set forth in the Manual, by presenting significant contrary evidence, or both. *See Bonstores Realty One, LLC v. City of Wauwatosa*, 2013 WI App 131, ¶¶5, 9, 351 Wis. 2d 439, 839 N.W.2d 893 (citation omitted). One way to overcome the presumption is to prove that an assessment does not comply with the uniformity clause and case law interpreting that provision. *U.S. Oil Co., Inc. v. City of Milwaukee*, 2011 WI App 4, ¶¶21-22, 331 Wis. 2d 407, 794 N.W.2d 904 (2010).

¶19 Here, the dispute centers around the uniformity clause, and more specifically, around whether the circuit court erred when it determined that the City's manner of assessing properties violated that constitutional provision. We therefore begin with an overview of Wisconsin law on uniformity. We then turn to evaluate the court's findings of fact and conclusions of law and the City's arguments that the court erred.

**A.**

¶20 The state constitution provides that "[t]he rule of taxation shall be uniform …." WIS. CONST. art. VIII, § 1. The underlying purpose of the constitutional provision is to promote taxing regimes in which all property owners pay in equal proportion to the full value of their property, and to ensure that assessments do not discriminate against individual property owners or classes of property. *Knowlton v. Board of Supervisors of Rock Cnty.*, 9 Wis. 410, 420 (1859) ("when property is the object of taxation, it should all alike, in proportion to its value, contribute towards paying the expense of such benefits and

protection"); *see also Manual* at 9-10. According to the Manual, "[u]niformity occurs when all property is assessed at full value or when all [statutory] classes of property are assessed at the same percentage of full value." *Manual* at 9-9.

¶21 The statutes governing assessments seek to promote uniformity by requiring that real property be assessed at "the full value which could ordinarily be obtained therefor at private sale," WIS. STAT. § 70.32(1), "using the 'best information' that the assessor can practicably obtain." *U.S. Oil Co.*, 331 Wis. 2d 407, ¶24 (citing *State ex rel. Levine v. Board of Rev. of Village of Fox Point*, 191 Wis. 2d 363, 372, 528 N.W.2d 424 (1995)). That said, Wisconsin case law also recognizes that "perfect uniformity of taxation is not obtainable." *Noah's Ark Fam. Park v. Board of Rev. of Vill. of Lake Delton*, 216 Wis. 2d 387, 394, 573 N.W.2d 852 (1998) (*Noah's Ark II*). As the Manual explains, "appraising is not an exact science" and "there will always be variances in individual properties. The ideal of every single property being valued at exactly 100% of its value … is a practical impossibility." *Manual* at 9-9.

¶22 Generally speaking, the uniformity clause may be violated if a property is assessed at market value and other comparable properties in the taxing district are undervalued—this results in an excessive tax burden on the taxpayer whose property was assessed at market value. *See Levine*, 191 Wis. 2d at 371-72; *U.S. Oil Co., Inc.*, 331 Wis. 2d 407, ¶25; *Walthers v. Jung*, 175 Wis. 58, 61, 183 N.W. 986 (1921); *Allright Props., Inc. v. City of Milwaukee*, 2009 WI App 46, ¶54, 317 Wis. 2d 228, 767 N.W.2d 567; *Noah's Ark Fam. Park v. Board of Rev. of Vill. of Lake Delton*, 210 Wis. 2d 301, 317-18, 565 N.W.2d 230 (Ct. App. 1997) (*Noah's Ark I*), *aff'd* by *Noah's Ark II*, 216 Wis. 2d 387.

¶23 However, and importantly, a taxpayer cannot "succeed on a uniformity claim simply by 'selectively picking a few low comparison assessments and then complaining that [the taxpayer's] property was overassessed.'" *Allright Props., Inc.*, 317 Wis. 2d 228, ¶58 (citing *Levine*, 191 Wis. 2d at 375). And this is for good reason—if such challenges were successful, "assessments [would] have … precarious stability, because common knowledge informs us that the average taxpayer can conscientiously testify that [their] holdings are valued too high in comparison with that of certain … neighbors." *Walthers*, 175 Wis. at 60-61. Instead, a taxpayer must demonstrate "such a general undervaluation of the other property [in] the assessment district as will result in an excessive tax as to" the taxpayer whose property was assessed at market value. *Id.* at 61; *see also* *State ex rel. Algoma Hous. Co. v. Board of Rev.*, 166 Wis. 2d 675, 682, 480 N.W.2d 786 (Ct. App. 1991).

¶24 As we explained in *Veritas 2019*, uniformity challenges tend to fall into three potentially overlapping categories: cases in which the assessor singled out the subject property for a discriminatory reassessment; cases in which the assessor used an assessment methodology that was "arbitrary and improper" because it systematically undervalued other properties in the district; and cases in which the taxpayer attempts to prove a uniformity violation based on "a general underassessment of other property in the district." *Veritas 2019*, No. 2022AP1934, ¶26.

¶25 To further elaborate, many successful challenges reflected in the case law fall into the first category—cases in which an assessor "singled out" the taxpayer's property for reassessment while at the same time declining to reassess other properties in the district. *See, e.g.*, *Noah's Ark II*, 216 Wis. 2d at 393. In the *Noah's Ark* case, for example, the assessor singled out a waterpark for

13

reassessment based on its recent sale price, which was significantly higher than its prior assessment. *Id.* at 388-89, 391; *see also Noah's Ark I*, 210 Wis. 2d at 306-07. At the same time, the assessor declined to reassess other commercial properties that had recently been sold based on their sales prices. *Noah's Ark II*, 216 Wis. 2d at 388-89, 391; *see also Noah's Ark I*, 210 Wis. 2d at 306-07. Our supreme court affirmed this court's determination that this disparate treatment was sufficient to prove a uniformity violation. *Noah's Ark II*, 216 Wis. 2d at 393; *see also State ex rel. Hensel v. Town of Wilson*, 55 Wis. 2d 101, 105, 197 N.W.2d 794 (1972) (rejecting the premise that "the sale price of one piece of property can be used to greatly increase its assessment while using a much lower valuation for other comparable property which has not had a recent sale").

¶26 Another way in which a taxpayer can demonstrate a uniformity violation is by proving that an assessor used an "arbitrary and improper" assessment methodology that had the effect of systematically undervaluing other properties in the district as compared to the taxpayer's property. In *Levine*, 191 Wis. 2d 363, for example, the taxpayers challenging their assessments owned newly constructed homes that were assessed based on recent arm's-length sales. *Id.* at 367, 370-71. When challenging their assessments, the taxpayers introduced evidence of the sales prices of four older homes in the district, which were assessed at values that were far lower than their recent sales prices. *Id.* at 368. When asked to explain the discrepancy, the assessor "testified that he did not rely on sales prices to determine the fair market value of certain older homes because, in his opinion, the purchasers of those homes were overpaying." *Id.* And the assessor readily acknowledged that his methodology for assessing older homes was "arbitrary." *Id.* Our supreme court determined that the taxpayers had proven a uniformity violation by introducing "ample" and "uncontroverted" evidence of

14

"an arbitrary assessment methodology that entailed improper considerations" and resulted in the general underassessment of "older properties in the tax district." *Id.* at 376; *see also id.* at 372 (explaining that "the general underassessment of older properties would constitute discrimination against purchasers of newer properties and, therefore, would violate the uniformity clause").

¶27 Finally, Wisconsin cases also hold out the possibility that a taxpayer might be able to successfully challenge a market value assessment of its property under the uniformity clause, even in the absence of evidence that the assessor singled out its property for special treatment or used an arbitrary or improper assessment methodology that systematically undervalued other properties. *Walthers*, 175 Wis. 58; *Algoma Hous. Co.*, 166 Wis. 2d 675; *Allright Props., Inc.*, 317 Wis. 2d 228. But the hurdle the taxpayer must overcome is significant— the taxpayer must demonstrate "such a general underassessment of property in the assessment district" as compared to the subject property "as will result in an excessive tax as to" the taxpayer challenging its assessment. *Walthers*, 175 Wis. at 61. It appears that such attempts are rarely successful. *Id.*; *see also Algoma Hous. Co.*, 166 Wis. 2d 675; *Allright Props., Inc.*, 317 Wis. 2d 228.

**B.**

¶28 With this background, we now turn to the City's argument that the circuit court erred when it determined that the City's assessment of the Veritas Property violated the uniformity clause. Whether the City has failed to follow constitutional or statutory requirements in making an assessment is a question of law that we review de novo. *Walgreen Co. v. City of Madison*, 2008 WI 80, ¶17, 311 Wis. 2d 158, 752 N.W.2d 687. However, "[t]he weight and credibility to be given to the opinions of expert witnesses is 'uniquely within the province of the

fact finder.'" ***Adams Outdoor Advert., Ltd. v. City of Madison***, 2006 WI 104, ¶27, 294 Wis. 2d 441, 717 N.W.2d 803 (citation omitted); *see also* ***Bonstores***, 351 Wis. 2d 439, ¶6. When there is conflicting evidence, we defer to the circuit court's findings of fact and will not disturb the court's findings unless they are clearly erroneous. ***Bonstores***, 351 Wis. 2d 439, ¶6.

¶29    To prevail on its uniformity claim at trial, Veritas was required to show that, despite being assessed at market value, other comparable properties in the district were underassessed such that Veritas was made to bear more than its fair share of the tax burden in the district. *See* ***U.S. Oil Co.***, 331 Wis. 2d 407, ¶21. As we now explain, the City does not persuade us that the circuit court erred in any way when it determined that Veritas satisfied this burden.

¶30    The trial evidence, including testimony from employees at the assessors' office, largely tracked Landretti's description of the process the City followed to set initial assessments for apartment properties in tax years 2020, 2021, and 2022. The evidence included the following. The City did not do a "full revaluation" in any of these years.[9] The City instead started with the prior year's assessment roll and had to make initial or group determinations about how the assessments would be adjusted. As mentioned, for those "sales properties" that had been subject to a sale within the prior year, the City determined whether the sale was a valid arms-length transaction and valid for ratio purposes; if so, the City typically set the initial assessment at or near the sale price. By contrast, for the majority of properties that were not subject to a recent sale, the City applied a

---

[9] As we understand it, a full revaluation occurs when a municipality effectively starts over and assesses every property in the municipality.

trending multiplier to increase the prior year's assessment by a certain percentage. The City's witnesses testified that the trending multipliers were derived from the City's analysis of recent sales data.

¶31    Regarding the City's practice of setting the assessment of sales properties at or near the sales prices, the parties disputed whether the City's practice constituted "sales chasing," and whether that practice is required by or contrary to Wisconsin law.  The Manual does not talk about sales chasing at any length, but IAAO guidance defines it as "the practice of using the sale of a property to trigger a reappraisal of that property at or near the selling price."  The guidance further explains that the practice "causes invalid uniformity results and causes invalid appraisal level results, *unless similar unsold parcels are reappraised by a method that produces an appraisal level for unsold properties equal to the appraisal level of sold properties*."  (Emphasis added.)

¶32    As applied here, the City took the position that it was required by *Markarian*, 45 Wis. 2d 683, to set the assessment of sold properties at or near their sales prices.  The City further argued that it was not engaged in sales chasing because it was adjusting the values of both sold properties and non-sold properties each year (albeit by different methods).  By contrast, Landretti opined that it was inappropriate to set values for individual properties at their sales prices when conducting a mass appraisal.  Landretti also took the position that the City's trending process for setting the initial assessment for unsold parcels was not producing appraisal levels equal to the appraisal levels of the sold properties.  By way of example, Landretti pointed to his analysis of the "rate of change" of assessments of nearly 6,200 commercial properties in the district.  The analysis showed that the assessments of unsold properties increased by 10 to 12 percent on average each year, whereas sold properties increased in value by 21 percent in

2020, 23 percent in 2021, and 37 percent in 2022. This carried over into the apartment strata, with Landretti's data showing that in two of the three years, the average rate of change for non-sales apartment parcels in the district was significantly below the average rate of change for sales parcels.

¶33   Relatedly, the parties also disputed the effect that the City's practices had on statistical measures that are used to evaluate the performance of its mass appraisal assessments.   One such measure, called an "assessment/sales ratio," analyzes those properties that were subject to a recent arms-length sale, comparing the assessed values of those properties to their actual sales prices. *Manual* at 1-29, 6-19, 10-21.   To illustrate by example, the assessment/sales ratio is 0.5 when the assessed value is half the sale price, 1.0 when the assessed value equals the sale price, and 2.0 when the assessed value is double the sale price.   The closer the aggregate assessment/sales ratio is to 1.0, the better the mass appraisal is considered to be in predicting market value.

¶34   According to Landretti, the City's practice of using the actual sales prices to set the initial assessments of sold properties distorted the data and undermined the usefulness of assessment/sales ratios to evaluate assessment performance.   That is, in Landretti's view, the process created an inaccurate impression that the City's mass appraisal process was accurately predicting market values.   In reality, Landretti opined, the reason that the assessments closely mirrored sales prices is because the City expressly adopted the known sales prices as the assessed values for all sold properties.

¶35   To illustrate the distortion that he claimed the practice caused, Landretti projected what the annual assessments of certain sold properties would have been if the assessments had been set through the process of applying trending

multipliers, rather than by relying on their sales prices. Landretti then compared the hypothetical trended values to the actual assessments, which were based on their actual sales prices. Landretti's analysis showed that on average, the annual assessments of sold properties increased by much larger percentages when they were set at sales prices than the assessments would have increased if the City used the trending multipliers that it was using to assess non-sales parcels. The City disputed the usefulness of Landretti's analysis of assessment ratios, characterizing it as being based on "hypothetical" data that cannot properly be used to establish a constitutional violation.

¶36    After considering the evidence, including the testimony by each expert, the circuit court determined that Veritas had proven a uniformity violation in each of the challenged years. As we read the court's analysis, the court credited Landretti's testimony that the City's mixing of different methodologies to assess sold and unsold properties resulted in a uniformity violation in which the majority of properties, which were assessed through the trending process, were significantly underassessed. In essence, the court determined that the City employed an arbitrary method when it used actual sales prices for some properties and the trending process for others, and that Landretti's statistical analyses demonstrated that the method systematically undervalued the majority of properties that had not been subject to a recent sale. And as we understand it, the court determined that the Veritas Property was made to bear more than its fair share of taxes because, like the sold properties, its assessment was based on full market value, which was significantly higher than the majority of apartment properties in the district, which were unsold and systematically underassessed.

¶37    It was within the circuit court's discretion to credit Landretti's testimony, and the court did not err by doing so based on this record. It is notable

that Keene, who provided expert testimony on behalf of the City, did not offer a robust critique of Landretti's analysis and conclusions—the court found that "a close reading of the testimony reveals that Keene actually supports Landretti's findings." Indeed, Keene seemingly agreed that the process the City used was likely to result in uniformity problems. Keene instead opined that perfect uniformity is not possible and that certain Wisconsin cases and assessment principles, including the three-tiered *Markarian* hierarchy, make it difficult for assessors to achieve uniformity in taxation.

¶38 The City makes various arguments about circuit court error on appeal. The organization of the City's appellate briefing is somewhat haphazard, but at bottom, most of its arguments appear to be aimed at showing that Veritas did not overcome the presumption of correctness.[10] We address the arguments as best we understand them, ultimately concluding that the City does not persuade us that the court made any error with respect to its findings or conclusions of law.

¶39 The City makes assorted references to our opinion in *Veritas 2019*, and appears to be arguing that the position Veritas took at this trial was no different than the arguments and evidence we rejected in that case. If that's the City's argument, it is mistaken. In *Veritas 2019*, the problem we identified was that Veritas had not attempted to "present[] evidence that the City singled out its property" or "used an arbitrary assessment methodology in assessing other

---

[10] Veritas disputes whether the presumption of correctness attaches to the City's final assessments, which were set through the board of review process, in contrast with the initial assessments, which were set by the City's appraisers. We need not resolve this dispute because, with or without the presumption of correctness, our resolution of the appeal would be the same. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

properties." ***Veritas 2019***, No. 2022AP1934, ¶39; *see also **id.***, ¶39. Accordingly, under those circumstances, Veritas needed to demonstrate "a general underassessment of other property in the assessment district." ***Id.***, ¶26. Veritas provided a statistical analysis identifying six apartment properties in the assessment district that were arguably underassessed, and we determined that its statistical analysis was inadequate to satisfy that standard. ***Id.***, ¶¶50, 55.

¶40 Here, by contrast, Veritas did not "selectively pick[] a few low comparison assessments" in the district in an attempt to prove "a general underassessment of other property." *See supra* ¶23 (citing ***Allright Props., Inc.***, 317 Wis. 2d 228, ¶58; ***Levine***, 191 Wis. 2d at 375). Instead, Veritas set out to prove that the City used an arbitrary and improper assessment methodology. Its theory of the case was based on the concept of sales chasing, and as we have already summarized, Veritas used data including rates of change to show that the trending process that the City applied to non-sales apartment parcels systematically undervalued those properties when compared to the process used to set the assessment of apartment properties that had sold. By all appearances, Veritas absorbed the lessons of its loss in ***Veritas 2019*** and applied those lessons to button up its theory and provide the evidence needed to support that theory, and the circuit court found Veritas's theory and evidence to be persuasive.[11]

¶41 The City argues that the circuit court's findings are based on "hypothetical" data, and that such data is insufficient to overcome the presumption

---

[11] The City asserts that the circuit court did not make any finding of fact that the City used an arbitrary and improper assessment methodology. We disagree with this argument, which elevates form over substance. Here, the court expressly found that the City improperly mixed methodologies and engaged in sales chasing.

of correctness. But the data the court relied on cannot all be characterized as hypothetical. As noted, Landretti analyzed the average increase in the assessments of sold and unsold parcels, and his analysis showed that the rate of change of unsold properties was significantly less than the rate of change of sold properties. These numbers were directly derived from the City's data.

¶42    To be sure, Landretti did present some hypothetical numbers in his analysis of assessment/sales ratio. As noted, he projected what the assessments of certain sales parcels would have been had the City used the trending multipliers, rather than their recent sales prices, to set their assessments. But this data, hypothetical though it was, was relevant and probative because it allowed Landretti to demonstrate the extent to which the City's practice of setting the assessments at or near sales prices was distorting the assessment/sales ratio data.[12] The IAAO guidance provides that this is a useful measure to evaluate the effect that sales chasing has on data, and the City has not identified any conceptual or mathematical error in Landretti's analysis. At most, Keene asserted that Landretti's analysis of assessment/sales ratios was not based on a sufficient number of properties, but Landretti's analysis was based on every one of the apartment properties in the City that was sold in the relevant years. The City does not identify any larger data set that Landretti could have or should have used.

¶43    The City argues that there is no law suggesting that the assessments of unsold properties have to increase in price by the same percentage as the assessments of sold properties. Although this is true, it is beside the point. It was

---

[12] The City also characterizes Landretti's data as "fictional," but we do not understand it to mean anything more than the hypothetical data we have described.

within the circuit court's discretion to credit Landretti's opinion that the differences in the average rate of change of sold and unsold properties constituted persuasive evidence that the City's process systematically undervalued a majority of the unsold apartment properties in the district.

¶44     Finally and perhaps most fundamentally, the City argues that it was required as a matter of law to set the initial assessments of sales properties at or near the sales prices due to the *Markarian* hierarchy set forth in WIS. STAT. § 70.32(1) and (2).  As noted, in *Markarian*, 45 Wis. 2d 683, our supreme court recognized that the statute "sets forth a hierarchical valuation methodology for arriving at a property's fair market value" that is comprised of "three 'tiers' of analysis."  *Lowe's Home Ctrs., LLC v. City of Delavan*, 2023 WI 8, ¶¶27-28, 405 Wis. 2d 616, 985 N.W.2d 69, 405 Wis. 2d 616.  A tier 1 analysis examines a recent arm's-length sale of the property that is being assessed; a tier 2 analysis examines "recent arm's-length sales of reasonably comparable properties"; and a tier 3 analysis "may consider all the factors collectively that have a bearing on the value of the property."  *Id.*, ¶¶29-30.  The *Markarian* court explained that an assessment must be based on the "best information" available to the assessor, and when tier 1 or tier 2 data were available, it was impermissible to set an appraised price based on tier 3 methods.  *Markarian*, 45 Wis. 2d at 686.

¶45     Turning to the mass appraisals it conducted here, the City argues that *Markarian* is the controlling law and the City had no choice but to set the initial assessment of sold properties at or near their sales prices.  By contrast, Veritas takes the position that when an assessor is conducting a mass appraisal, the assessor is not required to follow the *Markarian* hierarchy—and indeed should not follow the *Markarian* hierarchy—to set assessments of individual properties. Veritas argues that the entire premise of a mass appraisal is to make predictions

about categories of similar properties en masse, not to determine the actual fair market value of individual properties, and Veritas cites the recent *Metropolitan* decision from our supreme court in support. *See Metropolitan Assocs.*, 379 Wis. 2d 141. The *Metropolitan* court did not squarely address this precise issue, but it did explain that "[m]ass appraisal stands in contrast to single property appraisal," *id.*, ¶10, and it further explained that the "hierarchical valuation methodology" established by *Markarian* was to be used "for single-property appraisal," *id.*, ¶31.

¶46   We need not resolve the parties' dispute about the applicability of the *Markarian* hierarchy for purposes of resolving the City's challenge to the circuit court's decision. Even if the City is correct that it was required to set the assessed value of individual properties at their sales prices when conducting a mass appraisal, that does not relieve the City of the constitutional uniformity requirement. As the IAAO standards explain, the practice of setting assessments of sales properties at or near the sales prices can produce results that are not uniform "*unless similar unsold parcels are reappraised by a method that produces an appraisal level for unsold properties equal to the appraisal level of sold properties*." (Emphasis added.) The court reasonably credited Landretti's analyses and determined that that was not done here.

¶47   In sum on this issue, the circuit court did not err by crediting Landretti's analysis and concluding that the City violated the Wisconsin Constitution's uniformity clause by assessing Veritas's apartment complex at full

value while assessing other apartments throughout the district at significantly below their fair market values.[13]

## II. Veritas's Challenge with Respect to Remedy

¶48    When a taxpayer proves that its full value assessment was excessive in comparison to other properties in the district, "[i]t is not feasible to order a remedy that satisfies both the constitutional mandate of uniformity and the statutory requirement that real property be assessed at full value." *Levine*, 191 Wis. 2d at 377. Faced with this dilemma, the *Levine* court "opt[ed] to satisfy the constitutional mandate of uniformity … despite the fact that doing so compels the [local] board [of review] to act at odds with the statute." *Id.* at 378. It remanded the matter for the board to "reassess the [taxpayers'] real property to harmonize those values with the lesser assessed values of the … comparable properties." *Id.* In other words, the court instructed the board to "bring the amount of [the challenged] assessments into conformity with the assessments of the … comparable properties" in the challenged tax years. *Id.*; *see also Noah's Ark I*, 210 Wis. 2d at 322-23 (directing the board of review to reassess the subject

---

[13]    Before closing on this issue, we briefly comment on other arguments the City may be making. In its opening brief on appeal, the City argued that the circuit court erred by sustaining an objection to a question its attorney asked one of Veritas's witnesses about the assessment of a different apartment property that is owned by the same entity that owns Veritas Village. Veritas responded that the question was irrelevant, and the City does not address this issue further in its reply brief. We conclude that the City has conceded the issue by failing to reply to Veritas's relevancy argument. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, 304 Wis. 2d 750, 738 N.W.2d 578 (lack of response to an argument can be taken as a concession).

To the extent that the City intends to make other arguments, we deem them undeveloped and decline to address them. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider undeveloped arguments).

property "in a manner that conform[ed] to the manner in which other commercial property was reassessed" in the challenged tax year).

¶49      The parties agree that WIS. STAT. § 74.39(1) and (3) apply to this situation.  Section 74.39(1) sets forth the default procedure.  It provides that "the [circuit] court, before entering judgment, shall continue the action to permit reassessment of the property" by the board of review.  § 74.39(1).  However, § 74.39(3) provides an exception.  Under that exception, the court is allowed to "proceed to judgment without ordering a reassessment," provided that the court finds that it is "in the best interests of all parties to the action" to do so and the court is "able to determine the amount of unlawful taxes with reasonable certainty."  § 74.39(3); *see also* ***West Capitol, Inc. v. Village of Sister Bay***, 2014 WI App 52, ¶¶51-56, 354 Wis. 2d 130, 848 N.W.2d 875 (applying these standards).  These are both factual findings that we will affirm unless they are shown to be clearly erroneous.  ***West Capitol, Inc.***, 354 Wis. 2d 130, ¶51.

¶50      Here, although the circuit court found that it would be in the best interests of both parties if the court could make a determination of the amount of unlawful taxes, the court also found that it was unable to determine those amounts with reasonable certainty.  Veritas argues that this later determination was in error. It argues that the amount of unlawful taxes can be determined with reasonable certainty, and that the court should have made that determination instead of remanding to the board of review.

¶51      As noted, the remedy should bring the assessments of the Veritas Property into conformity with the assessments of "comparable properties." ***Levine***, 191 Wis. 2d at 378.  However, that requires the court or entity that is

making the decision to choose between properties that should be considered to be comparable for purposes of making a uniform assessment.

¶52      Throughout the circuit court proceedings, Veritas identified multiple sets of properties that it submitted could be considered comparable, and each different set would result in a different determination about the amount of unlawful taxes Veritas had paid.  For purposes of establishing a uniformity violation, Landretti calculated that the properties in the apartment strata were, on average, assessed at 84.6 percent of their fair market value in the three relevant tax years.[14]  Yet Veritas did not propose that the assessed price of the Veritas property be set at 84.6 percent of its full value (which would amount to a 15.4 percent reduction).  Instead, Landretti opined that a larger reduction is warranted, and he supported that opinion with his assessment of a statistical measure called "price related differential."  According to his analysis, the district-wide underassessment of apartment properties was more pronounced in higher value apartment buildings like the Veritas Property than it was in lower value apartment buildings.  Therefore, Landretti opined, the assessments on the Veritas Property should not be harmonized with the assessments of the apartment strata as a whole, but rather with a smaller set of apartment properties that were more comparatively underassessed than the strata as a whole.

¶53      In his expert report, Landretti presented a chart that identified seven different subsets of "similar properties" with which Veritas's property could be

----

[14] This is an aggregate weighted number—Landretti calculated that apartment properties were assessed at an average of 90.83 percent of fair market value in 2020, 65.76 percent of fair market value in 2021, and 87.13 percent of fair market value in 2022.

compared.[15]   Landretti then calculated the average per-unit assessment of each of the seven subsets and determined what Veritas's assessment would be in each of the three years if harmonized with each of those subsets.  The numbers in the chart ranged from a low of $11,340,000 to a high of $32,434,600.

¶54   In his report and his trial testimony, Landretti proposed a "remedied subject assessment" of $23,571,700 in 2020, $22,764,400 in 2021, and $30,071,100 in 2022.  Landretti calculated those numbers based on his analysis of the assessment/sales ratio of four downtown apartments that City assessors had previously used as comparable properties to the Veritas Property.

¶55   Then, in its post-trial brief, Veritas acknowledged that the circuit court had "numerous avenues by which it could harmonize Veritas's assessments with that of its comparable properties."  Veritas's post-trial brief included the chart in Landretti's report that identified the seven subsets of potentially comparable properties.  The post-trial brief recognized that Landretti had chosen to attempt to harmonize Veritas's assessments with four downtown apartment properties "that the City itself determined were comparable," and then posited that it was "within [the circuit court's] discretion to remedy the City's Uniformity Clause violation with any of the [] groups of comparable properties" that Landretti had listed in his chart.  "That being said," the brief continued, "Veritas believes that the downtown wood frame buildings are its direct competitors and most comparable properties,"

---

[15] As we best understand Landretti's chart, these subsets included: all similarly sized apartment buildings in the same assessment area (as defined by the City) as Veritas; all similarly aged apartment buildings in the same assessment area as Veritas; all similarly sized apartment buildings in the city; all similarly aged apartment buildings in the city; the set of downtown apartment buildings; the set of downtown apartment buildings with wood frame structures; and the set of four downtown apartment complexes that the City had used as comparable properties in prior assessments of the Veritas property.

and it asked the court to order refunds based on an assessed value of $23,635,000 for 2020, $25,515,000 for 2021, and $29,106,000 for 2022.

¶56    In its opening brief in support of the cross-appeal, Veritas candidly admits that "[t]he [circuit] court's finding that it could not determine a remedy with reasonable certainty likely stemmed from having too many options."  Yet, rather than focusing on one of the "options" that was actually presented to the circuit court, Veritas now asserts that the court should or could have landed on a different assessed value.  The remedy Veritas now proposes for the first time on appeal is an across-the-board reduction of the three years of assessments by 24.84 percent.   As we understand it, Veritas asserts that this number would represent an "average reduction" based on the seven different subsets of potentially comparable properties that Landretti analyzed and included in his summary chart.[16]

¶57    Veritas fails to establish that the circuit court erred.  It seems to be arguing that the court was required to pick a number if there was credible evidence to support that number.  But Veritas misreads the statute, which unambiguously allows a court to proceed to judgment only after finding that it is "able to determine the amount of unlawful taxes with reasonable certainty."  WIS. STAT. § 74.39(3).  As noted, this is a factual finding, and here, the court's finding that it

---

[16] Veritas includes a new summary chart in its appendix on appeal, that was not presented in the circuit court.  Veritas asks us to take judicial notice of the chart under WIS. STAT. § 902.01.  Although we have reviewed the chart, which we understand to be based on Landretti's assessments, we decline to take judicial notice of its contents.  Among other things, it is not self-evident from the chart how Veritas calculated the "total average" of 24.84 percent.  Even when we attempt to follow the description in Veritas's briefing, which is not immediately intuitive, we are unable to recreate the "total average" identified in the new chart based on the other numbers in the chart.  Indeed, it appears that the asserted total average may be based on at least one mathematical error.

could not determine the amount for the property with reasonable certainty was not clearly erroneous. *See West Capitol, Inc.*, 354 Wis. 2d 130, ¶51. This is especially so given the multiple different comparable properties that could be used, each of which would result in a different assessed value and a different amount of unlawful taxes. Accordingly, the court did not err when it remanded to the board of review.

### III. The City's Challenge to the Discovery Sanction

¶58 The City argues that the circuit court erred when it determined that the City failed to fulfill its discovery obligations and sanctioned it accordingly. The following additional background pertains to this discovery issue.

¶59 During discovery, Veritas requested production of a spreadsheet that the City maintained which contained assessment data "including assessment[s] for each year from 2017-2022." This request came in January 2024, shortly after our *Veritas 2019* decision was issued.

¶60 The City objected to the request "to the extent the request is not reasonably calculated to the discovery of admissible evidence, seeks documents and information not proportional to the needs of the case, and for other reasons stated in WIS. STAT. § 804.01(2)(am)," which addresses proportionality. To justify these objections, the City pointed to Veritas's concession, for the purposes of the litigation, that the 2020-2022 assessments "represent the full market value" of the Veritas Property. Accordingly, the City asserted, "this information has no bearing on this case." Whether deliberate or not, the City's objection entirely disregarded the nature of Veritas's theory of recovery, which was aimed at proving a uniformity violation by showing that other properties in the apartment strata were underassessed.

¶61 During the meet and confer process, Veritas identified our decision in *Veritas 2019*, and its discussion about what would be needed to prove a uniformity violation, as the legal basis for its discovery request. Specifically, Veritas explained that for purposes of proving a general underassessment of other properties in the district, it needed information about how the City set the assessments of other commercial properties. In response, the City identified three reasons that it should not be required to produce the requested documents. It continued to assert that the information was irrelevant and that the request was not proportional to the needs of the case. It also asserted that, if Veritas needed information from the City to support its case, then Veritas lacked a factual basis to bring a lawsuit in the first place.

¶62 Veritas filed a motion to compel on March 12, 2024. Among other things, it again cited our *Veritas 2019* decision and argued that the City's relevancy-based objections fundamentally misapprehended the disputed issue in the litigation. Veritas also argued that the City's other reasons were unfounded and misapprehended the function of civil discovery.

¶63 After receiving Veritas's brief in support of the motion to compel, the City provided a supplemental production of a PDF copy of a spreadsheet from tax year 2022. It provided this document on April 5, 2024, and it amended its discovery response several days later.

¶64 The spreadsheet that the City produced was in an Adobe Acrobat format, meaning that the formulas and metadata embedded in the spreadsheet could not be viewed. In its amended response, the City continued to object to the request on the grounds previously stated—relevancy, proportionality, and "for other reasons stated in WIS. STAT. § 804.01(2)(am)," and it repeated its assertion

that the request had "no bearing on this case" because Veritas was not contesting that the Property's fair market value was equal to its assessed value. However, "[s]ubject to and without waiving said objections" and pursuant to Veritas's agreement to limit its request to "the relevant tax assessment years," the City produced the PDF from 2022.[17] Veritas disputed the adequacy of the PDF production and requested the spreadsheet in Excel format (sometimes referred to as "native format"), but the City refused to provide the Excel version. As we understand it, the City's refusal to send the document in native format was based on the fact that an Excel document can be modified.

¶65 In its brief responding to the motion to compel, the City abandoned its prior relevancy- and proportionality-based objections and instead asserted other reasons that the motion was unfounded. It insinuated that Veritas's motion was not based on Veritas's need for the information contained in the spreadsheets, and was instead based on Veritas's desire to secure an extension for its expert report. Relatedly, it referred to Veritas's request for the Excel documents with their formulas and metadata as a "moving target game to delay and harass the City to keep this motion [to compel] alive." The City argued that PDF was a useable format, that its recent PDF production gave Veritas the information it reasonably needed, and that Veritas was not justified in holding out for Excel copies.

¶66 The circuit court heard argument on May 30, 2025. During that hearing, the City made a new objection to producing the data in Excel format—the

---

[17] As we understand it, the City limited its production to the 2022 spreadsheet because Landretti had already disclosed an expert report that addressed his opinions for 2020 and 2021. It appears that the reason the City limited its supplemental production was based on the premise that Veritas did not need the information from the earlier years because Landretti would not be allowed to supplement his report with respect to the 2020 and 2021 tax years.

City explained that it obtains "confidential income and expense information" about other properties through the board of review process, and that confidential information might be included in its Excel spreadsheets. Although the City did not cite any legal authority during the hearing, it later identified WIS. STAT. § 70.47(7)(af) as the source of its requirement to keep information confidential. That statute provides that municipalities "shall provide by ordinance for the confidentiality of information about income and expenses that is provided to the assessor under this paragraph," and that information provided to the board of review "is not subject to the right of inspection and copying under [Wisconsin's public records law, WIS. STAT. § 19.35(1),] unless a court determines before the first meeting of the board of review that the information is inaccurate." § 70.47(7)(af).

¶67    When the City first raised confidentiality during the hearing, the circuit court responded that income and expense information could be kept confidential through the use of a protective order. Veritas indicated that it would accept the production under an "Attorneys Eyes Only" designation, meaning that the spreadsheets could be viewed only by Veritas's attorneys and designated experts.

¶68    The circuit court granted the motion to compel. It determined that Veritas was asking for the information in Excel format and the City maintained the information in that format, so the City was required to produce it in that format under a confidentiality designation. The court held the issue of attorney fees under advisement.

¶69    Following the resolution of disputes about the language of the protective order, the City produced the requested spreadsheets in Excel format on

July 16, 2024. The circuit court then took up the issue of Veritas's attorney fees. Veritas argued that the City had abandoned all of the objections it raised prior to the hearing and that the confidentiality concerns that the City raised for the first time during the hearing did not substantially justify the refusal to produce discovery. The City filed a lengthy response, arguing among other things that the court "should not impose costs on the City for defending its statutory obligations" to keep income and expense information confidential as required by WIS. STAT. § 70.47(7)(af). For the first time, the City implied that that statute creates an evidentiary "privilege" that would shield the excel spreadsheets from discovery.

¶70 The circuit court entered a written order. It cited WIS. STAT. § 804.12(1)(c)1, which provides that a court "shall" award a party prevailing in a discovery dispute its fees and costs "unless the court finds that the opposition to the motion was substantially justified." As applied here, the court found that "[t]he City's shifting rationale for withholding discovery lacked merit and/or came too late in this litigation to matter," meaning that "City's opposition was not substantially justified." As the court explained, Veritas had been forced to file its motion after the City claimed that the requested information had "no bearing on this case"—a position that was demonstrably inaccurate and triggered the motion to compel. Assuming without deciding that the City stated a legitimate rationale at the hearing for insisting that the documents be produced under a confidentiality designation, that rationale was provided only after the motion was filed and the briefing was complete. As for the City's new position that the information was "privileged," the court rejected the assertion as unsupported.

¶71 "A discovery sanction represents a discretionary determination," and an appellate court examines the sanction that the circuit court imposed for an erroneous exercise of discretion. *Mohns Inc. v. BMO Harris Bank N.A.*, 2021

WI 8, ¶33, 395 Wis. 2d 421, 954 N.W.2d 339.  The City raises three arguments on appeal, none of which demonstrates an erroneous exercise of discretion by the court.

¶72     The City first argues that the circuit court failed to acknowledge that the City provided the requested spreadsheet (more accurately, one of the requested spreadsheets) in PDF format.  But that fact is undisputed, and the City fails to explain how an acknowledgement of that fact could move the needle in any appreciable way.  Here, to show that the court erroneously exercised its discretion, the City needs to show that it was "substantially justified" in opposing Veritas's discovery request.  The fact that the City eventually provided a PDF version to Veritas, which the court ultimately deemed was inadequate, does not demonstrate that the City was justified in opposing the request.

¶73     The City also cites *Alt v. Cline*, 224 Wis. 2d 72, 95, 589 N.W.2d 21 (1999), for the proposition that the City "should not have to choose between sanctions and upholding a privilege."  But this argument fails for two reasons. First, the City did not timely assert any privilege—the City did not raise confidentiality as an issue until the motion hearing, at which point the issue was immediately dealt with, and it did not mention the concept of privilege until its brief opposing the motion for costs.  And second, the City fails to support its bare assertion that WIS. STAT. § 70.47(7)(af) established an evidentiary privilege that shields information in its spreadsheets from discovery.  *Franzen v. Children's Hosp. of Wisconsin, Inc.*, 169 Wis. 2d 366, 386, 485 N.W.2d 603 (Ct. App. 1992) ("If it is asserted that information is privileged, the party asserting the privilege bears the burden to establish that the privilege exists."); *Alt*, 224 Wis. 2d at 95 ("[a]n unsubstantiated and unfounded privilege is not substantial justification for not imposing sanctions").

¶74 The City relies on WIS. STAT. § 70.47(7)(af), which provides that information and expense information produced during the board of review process is confidential and not subject to disclosure via the public records law except under certain circumstances that are inapplicable here. Yet just because information might be considered *confidential* does not mean that it is *privileged*. *See* WIS. STAT. ch. 905 (identifying evidentiary privileges, including the lawyer-client privilege, the physician-patient privilege, and the husband-wife and domestic partner privilege, and the privilege that governs communications to the clergy). "Privileges are the exception, not the rule," *Alt*, 224 Wis. 2d at 85, and WIS. STAT. § 905.01 provides that privileges are recognized only "as provided by or inherent or implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin." The City cites no law to support its implicit assumption that information must be privileged if it is exempt from disclosure under the public records law, WIS. STAT. § 19.36(1). Just because a record may be exempt from public disclosure does not mean that the information it contains is privileged, and merely labeling a statutory obligation pertaining to confidentiality as an evidentiary privilege does not make it so.

¶75 Finally, the City also argues that Veritas failed to prove that the attorney fees it requested were reasonable. The City asserts that the billing records on which the circuit court relied were inadequate, but the City fails to support that argument and we could reject its challenge to the fee award on that basis. Instead, we reject the challenge on the merits because it is unfounded—the record shows that the court reviewed Veritas's attorneys' billing entries, highlighted the entries that it believed were reasonable and sufficiently related to the motion to compel, and awarded fees on that basis. The court properly exercised its discretion in determining the amount of attorney fees.

## CONCLUSION

¶76    For the reasons explained above, we reject the arguments that the City makes in support of its appeal as well as the arguments that Veritas makes in support of its cross-appeal.   We therefore affirm all challenged aspects of the circuit court's order.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.